### SMITH v. IRISH et al.

(Supreme Court, Appellate Division, Fourth Department. January 18, 1899.)

1. City Board of Health—Removal of Nuisance—Dangerous Buildings.

A city board of health may remove a nuisance consisting of a building, or a part thereof, dangerous to the lives of pedestrians passing along the adjacent sidewalk.

2. Same.

Where a city board of health has removed a part of a burned building, on the ground that it was a nuisance, in that its condition was dangerous to the lives of the public, entitled to use the streets and sidewalks adjacent thereto, they must be prepared to show that it was in fact a nuisance, when their action is called in question.

Appeal from trial term, Cattaraugus county.

Action by Eva E. Smith against William M. Irish and others. From a judgment for plaintiff, and from an order denying a new trial, defendants appeal. Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, and McLENNAN, JJ.

A. J. Hastings, for appellants.

J. H. Waring, for respondent.

McLENNAN, J. This action is brought to recover damages for injuries claimed to have been done in March, 1898, by the direction of the defendants, to a brick building owned by the plaintiff, situate at the northwest corner of Laurens and Union streets, in the city of Olean, N. Y. The building was erected about the year 1877. It was 21 feet facing on Union street, and 96 feet on Laurens street. Union street extends north and south, and is the principal business street in the city. Laurens street runs west from Union street, at right angles to it, and is also one of the principal business streets. The building is a three-story brick structure, with a cellar or basement beneath. The frame was what is known as the "balloon-pattern," made by setting studding, 2x4 inches, upright, and about 18 inches or 2 feet apart. Those were fastened to joists extending from one side of the building to the other, upon which floors for each story were laid. Sheeting consisting of inch boards was nailed to the studding on the entire outside of the building, except the openings left for doors and windows, and upon the outside of such sheeting there was laid one course of brick, about four inches thick, which was fastened to the sheeting by nails, being

what is commonly called a "veneered brick building." The building had upon it a flat, tin roof, which sloped slightly from Union street towards the west.    There was a galvanized iron cornice along the entire street sides, which projected out and over the streets.    On the morning of the 5th of March, 1896, the building caught fire, and concededly was injured to a considerable extent.    Certain of the studding, joists, and rafters were burned off, and about 30 feet of the roof fell to the floor below.    In extinguishing the fire the fire department of the city put a large amount of water on and into the building, and to such an extent that it was thoroughly soaked.    At the time of the fire the weather was very cold.    The water was frozen, and the building, from the roof to the cellar, was substantially covered with ice.    Immediately after the fire, by direction of the city authorities, the streets adjacent to the building were barricaded, so as to prevent people from traveling thereon.    That being the situation, the defendants, who constituted the board of health of the city of Olean, and were acting as such, caused G. Gillingham and B. U. Taylor, two experienced builders, to examine the building for the purpose of ascertaining whether or not its condition was then such as to make it dangerous to life, because of its liability to fall upon the street.    On the 6th day of March, 1896, the day after the fire, those gentlemen made an examination of the building, and on that day reported to the board of health that the building, in their opinion, was unsafe, and that the third story should be removed.    On the same day, March 6th, the board of health passed the following resolution:  "Resolved, that a notice be served on the owners, agents, or occupants of the Smith Block, located at the corner of Union and Laurens streets, requiring them to cause the removal of the entire third story of said block within five days."    On the 7th of March, 1896, such resolution, together with the reports of Mr. Gillingham and Mr. Taylor, was served upon Mr. J. B. Smith, the husband of the plaintiff, and who was acting as her agent in the management and control of the building.    The plaintiff, or her agent, did not remove the upper story of the building, as directed by the defendants, within five days, and on the 13th day of March, 1896, the defendants entered into a contract with one F. William Goltz, by which said Goltz was to remove said upper story, and he immediately entered upon the work of such removal.    On the following day, March 14, 1896, Mr. J. B. Smith, the husband of the plaintiff, protested, by a communication in writing addressed to the defendants, against such removal, and urged that the building as it then stood was not dangerous, and was not liable to fall, to the injury of the public.    The defendants, however, persisted, and the entire upper story was removed by Mr. Goltz under their direction.    No question is made but that the removal was done in an entirely proper manner, the material being piled upon the street, and preserved in as good condition as could be reasonably done.    We think the defendants, constituting the board of health of the city of Olean, had ample power and authority to remove or cause to be removed the third story of the building in question, provided at the time it was a nuisance, and dangerous to the lives of persons who might desire, in the ordinary way, to travel upon the sidewalks adjacent thereto, and that to avoid such danger the defendants were not

required to barricade such sidewalks, and thus prevent the traveling public from using the same. The defendants, however, when their action is called in question, as in this case, must be prepared to show that a nuisance in fact existed, and that the condition of the upper story of the building in question was such as that to permit it to remain standing was dangerous to the lives of the public, who were entitled to use the streets and sidewalks adjacent to such structure, and that it was a nuisance. The rule is stated by Judge Earl in People v. Board of Health of City of Yonkers, 140 N. Y. 10, 35 N. E. 323, who, after referring to a large number of authorities, says:

"The result of these authorities is that whoever abates an alleged nuisance, and thus destroys or injures private property, or interferes with private rights, whether he be a public officer or private person, unless he acts under the judgment or order of a court having jurisdiction, does it at his peril; and when his act is challenged in a regular judicial tribunal it must appear that the thing abated was in fact a nuisance. This rule has the sanction of public policy, and is founded upon fundamental constitutional principles."

The witnesses who speak as to the condition of the building after the fire substantially agree. All say that certain of the studding which supported the walls of the third story were burned off; that the joists which formed the ceiling of the third story and the rafters were burned to such an extent that the roof fell in for a space of about 30 feet, onto the floor below, and in such position that it naturally would press the walls outward; that a heavy fall of snow occurring at the time would increase the pressure against the walls, and that a severe windstorm might or would cause the walls to fall. The witnesses called by the defendants state, in addition, that in certain places the brick veneer was loose from the sheeting, and at those places projected into the street; that a part of such veneering in certain portions of the building had fallen off. All agree that the walls were not plumb, and in places projected into the street from three to four inches. The one expert called by the plaintiff (Mr. Brickell) expressed the opinion that the building as it stood was safe, unless there should be a heavy fall of snow; that, if that occurred, he did not know whether the walls would have fallen or not. The two experts called by the defendants expressed the opinion that the building was unsafe, and was liable to collapse at any time. From the description of the building given by all the witnesses, it would seem quite evident to a person not an expert that it was liable at any moment to fall, especially so in case of a heavy fall of snow, or a severe windstorm. Several of the studding which supported the wall of the third story were burned off. The rafters and joists above the floor of the third story were burned to such an extent that they fell to the floor, and were left in such position as that their weight pressed outward against the walls; that the brick veneer was loosened in many places from the sheeting, and bulged outward towards the street. The building was filled with water, which was freezing, and would naturally tend to weaken the walls; and there was nothing, so far as appears, to protect the upper story of the structure against the action of the elements. It is impossible to determine positively what the result would have been had the walls of the building in question remained standing. We

are only concerned in determining what the preponderance of evidence indicates upon that question. A careful examination of the record leads us to the conclusion that the verdict was against the decided weight of evidence, and for that reason we think justice demands that a new trial should be had. We therefore conclude that the judgment and order appealed from should be reversed, and a new trial granted. This disposition of the case renders it unnecessary to consider the further questions presented by the appeal.

Judgment and order reversed, and a new trial granted, costs to appellants to abide the event of the action. All concur, except WARD, J., not voting.